All right, it looks like we are ready for our final case for today, perhaps this afternoon. Frank Pierri v. Medline Industries, 19-3356. We will begin with Mr. Kelleher. Thank you, Your Honors. Good afternoon. For five years, Frank Pierri was an asset to Medline Industries. When his grandfather's cancer treatments required one day of leave per week, he suddenly became a liability. This two-sentence synopsis embodies why summary judgment is improper. An employer may not make decisions based on the belief that an employee might miss work or leave work early to care for a disabled person, but that's precisely what happened here. Before Pierri took leave, he was treated well. He was promoted. He was assigned bonus-laden R&D work. After he takes leave, he is treated like a second-class citizen. The dichotomy could not be clearer. Mr. Kelleher, can I ask you a question about his being assigned to the quality control work? Was that within his job description? I know that he primarily had been doing R&D work after a time, and I know that you say that it was most often, people who were more junior, who didn't have degrees, who were doing the QC, but it seemed to me that it was within his job portfolio. I would probably conceive that. It's not entirely clear, but yes, I would agree that that was part of his work obligations, his duties. So explain to me, this is my question about the adverse employment action. It seems like that, if there's an adverse employment action, that's it. So explain to me, is it the fact that his bonus opportunities were decreased once he was doing the QC, or why does that count as an adverse employment action? Mainly because of the bonus issue. Judge Barrett, 95% of his work was, I should say prior to the leave request, 95% of his work was the R&D work, which is, that's the question Supervisor Tyler concedes, that if he doesn't do R&D work, there's no bonus. So that's that dichotomy between the QC and the R&D work, that was a downward shift in job responsibilities and skill levels. So there's two components. That's the first component, and then the second component, as your Honor notes, is the compensation factor. The bonus was essentially out of reach when he was taken off this R&D work. So explain to me how, what appear on the surface of things should be accommodations on Medline's part. First they let him, when he asks, work the 10-hour days, and then they say that that's not working, but they say you can apply for FMLA. He does. He gets the one day a week for the FMLA so that he can continue caring for the grandfather. Why is that something we ought to construe as retaliatory? Chief Judge Wood, I would respectfully disagree with one aspect of that characterization, and that is the FMLA leave. I concede initially Medline did make some concessions. They offered him and gave him that four-day-a-week, 10-hour schedule, but the catalyst was when he went for the FMLA leave in late January. And while ultimately they allowed him to do that, the retaliation essentially came almost immediately, and that's one factor I would quibble with the notion that they granted him the FMLA leave. They granted it, but in essence they granted it with one hand and then took it back with another in terms of the retaliation, removing the R&D work, obviously, as we already mentioned, singling him out for these time sheets. So it's a slew of things that happened here, mistreatment and indifferent treatment regarding the FMLA leave. So if this had been a workplace harassment case, I think you would have been put in a position to convince us that his experiences at the workplace, while certainly not pleasant, look like a bunch of petty slights, sort of snide remarks and rude things that one wishes never happened, but they do in the real world. So why are the things that are happening about, you know, you should go tell Laura you have other obligations or having, making threats that aren't carried through about certain things, why is that so bad that we need to characterize it as an adverse employment action? I think, Your Honor, because we need to look at it in a cumulative fashion, and we cite the two cases, Dave v. Colt Construction and Rogers v. Southwest Insurance Company. Those cases instruct us that we look at the whole picture. And I think, respectfully, counsel for Medline in the brief, they isolate things. And that's simply not the way to look at a situation like this. Any sort of employment case context, you look at the entire picture. I would concede that, you know, moving a desk or, you know, a threat that I'm going to punish you if you don't get these lab results done, I would admit that individually, it's not enough. But again, if we look at it as a collective, the picture changes. And we look at, again, most importantly, that replacing that R&D work with fiber testing. And that's a point we make in the briefs that really does not get countered in the response brief. That fiber testing work, it's work that's done by junior technicians or temporary employees. It's not the domain of chemist twos. So it's not only taking away the R&D work, but what are we replacing it with? We're replacing it with something inferior. So again, that... Can I ask you a question? You said that the primary to earn a bonus. Yes. But you have to be careful with that argument, don't you? Because we have cases saying that when you're not entitled to a bonus, that it's not an adverse employment action not to get one. So how does your argument not run up against those cases? Your Honor, I'm aware of that. It's a very fine line, obviously, that I have to walk. But again, I would make the point that what are we replacing it with? We're replacing it with this fiber test work, which again, doesn't enable him to get the bonus. And then I would... So your theory is a loss of opportunity theory as opposed to the loss of the bonus. You would concede he still might not have gotten a bonus. That's correct. That's correct. But it's also, if I can also shift, not to evade your question, but shift to the downward shift in job responsibilities. And that's the TARP case, the DOM case, the Collins case. It's not... Obviously, this transcends fiscal financial benefits. We're looking at what is the work he was doing before and now what is the work he's doing. And those three cases make clear that if there's a downward shift and it's essentially a demotion, that would be an adverse employment action as well. That's why I asked you the question of whether the QC work was within the purview. Like, was that within his portfolio? Because in the cases that you're pointing to, there was a more extreme downshift, like moving a desk and you're... They're just more identifiable things to point to. And it's also taking someone out of one job description and putting them in another. Whereas in your case, it's emphasizing a different portion or reallocating responsibilities within a portfolio, right? Yes. I would agree with that. The one caveat being that the fiber testing, frankly, the record is not clear as to whether that's quality control or something else. The only thing we know about this fiber testing is that it's the work of junior technicians without degrees or temporary employees. So quite frankly, I don't know if that would be considered QC or not. But all I can say and all I can emphasize is that, again, this was work that was out of the purview, out of the ken of chemist twos. But let me just clarify that. Are you saying out of the purview because it could have been done and typically was done by more junior people who were less skilled or less educated without degrees? Or are you saying that it was outside his purview, as in it was not part of his assignments? Because as I understood it, it was something that he sometimes did and could be called on to do. It was just the case that as a practical matter, 90% or 95% of his work beforehand had been R&D. I would agree with that assessment. All right. You're going to run out of time, but I'll give you a minute for rebuttal. But let's My name is David Chrisley, representing the appellee. First, I'd like to address the first question that was asked and whether this QC versus R&D work were both parts of Mr. Pieri's job. And they were. In fact, I think the best indication of that from the record is actually the worksheet regarding the bonus issue that Mr. Pieri submitted to his employer. And if you look at that, there are about six different categories of work for which he could achieve a bonus. In fact, the QC work, the work that he says he was unfairly shifted to, pays a larger bonus throughout the Is it clear that this fiber testing is part of the QC function? It is. That's been established in the record. He considered it to be QC work, as did Mr. Tyler. And furthermore, with regard to this bonus, while Mr. Pieri says he was not able to complete any QC work after his change in schedule regarding his grandfather, he in fact received $750 worth of that R&D related bonus for Q1 2016. Now, he was only eligible throughout the year to receive $3,000. So in the first quarter, he was able to receive $750, one quarter of that R&D related bonus. Had he continued to work the rest of the year rather than taking medical leave, he was on schedule to get the full $3,000 for R&D related tasks during that time. So it's very clear he had some R&D work to do. He got a quarter of that bonus in the first quarter and had the opportunity to get the rest of those three quarters worth of bonus in the remainder of the year on continued R&D projects. I'd also mention that Pieri's statements that he had, you know, had a certain percentage of R&D work at one point and then that that was decreased and his comparatives to other chemists in the lab that he believed were doing other work was based on his own speculation and conjecture. We had no evidence offered by Mr. Pieri other than his own statements about his own work that showed that he had any basis to know what other chemists were doing in the lab and certainly to the extent he did, that would have been hearsay. We never heard from any of these other chemists or from Mr. Tyler that this work had been handed out on those percentage basis that was entirely from him. A few other points I wanted to make and that I think should be noted in this case. You know, this is, these cases don't often come before the court. This is an associational discrimination case and under that, you know, he has chosen, although the district court noted that he didn't choose kind of one of the three hasn't pointed to him being distracted from work on the basis of his association with a disabled person. Although that's the prong he's chosen to pursue now, there just isn't any evidence of that in the record and no evidence in the record that anyone ever mentioned, commented upon, disparaged him regarding his association with his grandfather or his grandfather's illness. Rather, as the court noted at the outset, Mr. Pieri was never denied any kind of requested leave from work. There were absolutely no discriminatory kind of straight comments in this case about his grandfather or any disability. Mr. Pieri was never disciplined in any way during this case after asking to change his schedule and his pay and position never changed after his changing his schedule to take leave to care for his grandfather. Now, the plaintiff points out that his pay changed after he took leave. Well, that's true. When he took FMLA leave, like most individuals who take FMLA leave, that was unpaid leave. He then applied for and received disability benefits at 60% of his pay under short-term and long-term disability programs. But that's not an adverse employment action. If it were, that argument would string out to say that, well, anyone who takes FMLA leave, if they take FMLA leave and don't get paid for it, which is the normal course, that's an adverse employment action. You know, if you can show an adverse employment action that way, we won't have cases that involve leave that don't have adverse employment actions in them. That's not the law, and that's not the way the law was written. It's also important- So just to clarify, at the time he, at the mid-March 2016, when he takes his own FMLA leave, to distinguish it from the grandfather, he's on the four-day-a-week schedule at that point with the accommodation of the one day that had been approved for the teen. He asks to take a day off per week, well, basically to move to a four-ten-hour-a-day structure rather than a five-eight-hour-a-day structure. That's approved by Mr. Tyler, the kind of unfortunate boogeyman in this case, but Mr. Tyler says, that's fine. You can take care of your grandfather one day a week. We'll give you four-tenths. After six months of that, they say, well, your attention to your work hasn't been what we'd like. We'd like you to go back to the five-eight-hour days. And Mr. Tyler offers him to say, I know you have to take your grandfather in one day a week during the work week, so we'll allow you to move to a schedule where you get one day off during the work week, but you work during Saturdays. So basically, it's usually the Saturdays, still five days. Yeah, I know about the ten-hour days, but- Right, right. And so then that became the offer he received then around December of 2015. Well, he didn't want to do that because he had school on Saturdays that he wanted to attend. So rather than that, he decided, well, I'll take FMLA leave for the days I want to care for my grandfather. And that FMLA leave was approved, and he continued to take FMLA leave for the one day a week he of March 2016. And in the end of March 2016, he applied for FMLA leave, continuous FMLA leave- For himself, in a sense. For himself. For himself, and then never returned to work. And that's how we get to, ultimately, the issue of his discharge. Which is about a year and a month later, right? A year and a month later, the company reaches out to Mr. Pieri through his counsel and says, hey, we haven't heard from Mr. Pieri in over a year. We want to know if he's coming back to work. And if we don't hear from you in a week, we're going to assume that he's not coming back and we're going to discharge his employment. It's undisputed that the company never heard back from Mr. Pieri or from his counsel after that. And so about a year and a month later, two weeks after the contact with his counsel, they went ahead and discharged him from employment. Okay. Without any other further questions, I think we've covered what we need to today. We'd ask that the district court's grant of summary judgment be upheld. All right. Thank you. And I said, I can't remember where you were, Mr. Kelleher, but you can have a minute to rebut. Thank you, Judge Wood. Real briefly, I would just again stress the immediate time frame between the leave requests and the adverse actions. Again, this isn't an employee who had a history of bad conduct or bad work product. He excelled right up until this leave request. As far as counsel's arguments, I would respectfully disagree. These are credibility contentions. These are arguments, obviously, that will be made to a jury and in the brief, they make the same argument saying that, well, this is speculation. Well, they don't have any counter. There's no record sites, no counter in the brief to- Mr. Kelleher, it's Judge Scudder. I just have one brief question for you to respond to. Your adversary makes the point that, you know, the claim was pursued as an associational discrimination claim and it was assumed under the distraction theory. But didn't a plaintiff at summary judgment actually affirmatively put forward evidence himself that he was meeting all of MEDLINE's expectations and performing well at work? So even if we were to get, if we get into the associational discrimination claim and distraction, is there evidence in the record that he was distracted because of his grandfather's illness? I think because of the distraction, you know, the word itself obviously hasn't really been litigated or explained. It's bounded on by the courts. But I think the distraction is ultimately the need to have, at least in this case, to have an altered work schedule. So here he needs the Fridays off because he needs to take his grandfather for these medical treatments. But I would agree, Judge Scudder, that it may seem counterintuitive. I do think at the end of the day, if the associational discrimination claim fails under your logic, at least you still have the retaliation claim. But yeah, to definitively answer your question, he was meeting the standards, but he just, he was trying again to get a different schedule to care for his grandfather. And again, this is a textbook associational discrimination claim under that logic. All right. Thank you very much, Mr. Kelleher. Thank you, Mr. Chrisley. The court will take this case under advisement and we will be in recess.